**WORLD OIL CO., Inc., v. HICKS.**
**(No. 12132.)**

Court of Civil Appeals of Texas. Fort Worth. May 11, 1929.

Rehearing Denied June 22, 1929.

606

Samuels, Brown, Foster & McGee, of Fort Worth, for appellant.

Walter D. Nicholson, Clay Cooke, and Mack Taylor, all of Fort Worth, for appellee.

DUNKLIN, J. Prior to January 1, 1926, the World Oil Company was chartered under the statutes of Texas, with an authorized cap-

italization of $300,000, and all of that capital stock had been duly subscribed, fully paid for, and issued to some 7,000 individuals, including Chester R. Bunker, who was the president of the corporation. On or about May 20, 1926, by an amended charter duly filed, the capital stock was increased from $300,000 to $1,600,000.

This suit was instituted by L. R. Hicks to recover of Chester R. Bunker and the corporation on a parol contract which he alleged was made with him by Bunker, acting for himself and as the duly authorized agent of the corporation, and a recovery was sought against the defendants jointly and severally.

According to allegations in the petition, on January 1, 1926, Bunker agreed to employ the plaintiff to edit and publish a certain publication entitled "Market and Curb," commonly called a house organ or brokers' market sheet, and to publish and advertise therein stock in the said defendant World Oil Company, and to mail such advertisements to the then stockholders in said company, all for the purpose of inducing the sale of stock in World Oil Company.

It was further alleged that:

"The contract was to continue and be in full force and effect so long as the said stock in the said World Oil Company was continued for sale to the general public and the then stockholders in such company and until the said stock should be withdrawn from the market entirely; that the said plaintiff was to further assist in the sale of stock in the said World Oil Company and to accept and receive partial payments made upon stock sold upon the partial payment plan, as well as cash orders; and that the said plaintiff should furnish and send brokers' letters to and advertise to all of the customers of his said general brokerage business, World Oil Company stock, as well as advertising the same to the then stockholders of said company, and to the persons whose names appeared upon lists furnished to him by the said defendants."

According to further allegations in the petition, plaintiff was to receive for his services 10 per cent. of all moneys collected from the "sale of stock in the World Oil Company sold upon the partial payment plan, from and after the 15th day of April, 1926, through and during the period for which this contract was to run as aforesaid, and through and during the period from and after the 15th day of April, 1926, that stock in the said company which then existed or might be issued was offered for sale to the general public or to the then stockholders in said company, and that payments should be made by defendants to the plaintiff in such sums from the sale of stock in the manner and way aforesaid, so long as such stock should remain upon the market as aforesaid, and until the same should be entirely withdrawn from the market; and that said defendants agreed to pay to the said plaintiff such sum and sums aforesaid at the time the subscription to said stock was obtained, and the money paid thereon by subscribers thereto, and that such payments should be made regardless of whether partial payments upon subscriptions to such stock should be received through the said plaintiff or by the said defendants or their agents."

It was further alleged that:

"Defendants agreed to notify all stockholders and subscribers that plaintiff was their authorized agent to receive orders for stock subscribed for upon the partial payment plan and to receive all partial payments thereon, and said defendants agreed that said plaintiff should collect all moneys derived by said company from stock sold upon the partial payment plan during the term of such contract as aforesaid. That at the time of the making of the contract as hereinbefore set out, the plaintiff was an experienced and capable broker and experienced in the conduct of advertising campaigns of the character above described, and in the publication of brokers' sheets aforementioned."

According to further allegations in the petition, plaintiff relied upon said contract, and in pursuance thereof published in the publication called "Market and Curb" advertisements for the sale of said World Oil Company stock; that he continued said advertisements from January 1, 1926, until September 25, 1926; that between April 15, 1926, and September 25, 1926, stock was sold in the World Oil Company on the partial payment plan in the sum of $400,000, and that, since the last named date and in the future, additional stock has been sold and will be sold in the sum of $200,000, amounting in the aggregate to $600,000; that, by reason of the defendants' failure to pay him his 10 per cent. commission on such sales, he ceased advertising on September 25, 1926. He prayed for judgment for $60,000 as commission under the alleged express contract.

Plaintiff also pleaded in the alternative his employment by the defendants to perform the services enumerated in the first count of his petition; that he did the advertising mentioned in that count, by reason of which the value of the stock was advanced from 70 cents per share to $2.60 per share; that the advertising done by him was the procuring cause of such advance in the market value, and also of the sales made of the stock mentioned above, all of which sales were made for cash and on the partial payment plan to the then stockholders of the company and also to new subscribers; and, that, according to the custom and practice among oil companies, brokers, promoters, and publishers of market sheets, which custom was well known to said defendants, the reasonable value of his services so rendered was the sum of 10 per cent. of the aggregate sum of $600,000 of stock sold upon the partial payment plan; and that therefore the defendants impliedly

promised and agreed to pay him for said services on said basis, for which amount he prayed for judgment.

There is an absence in the record before us of any pleadings filed by the defendant Bunker, but the defendant World Oil Company filed an answer embodying a general demurrer and some twenty special exceptions; also a general denial; a plea that the contract sued on was not in writing, and that it was not to be performed within one year from the date of its execution, but was to extend for and during a number of years, and therefore was unenforceable by reason of the statute of frauds. The defendant also pleaded that the alleged contract, if made, was ultra vires the powers of the corporation and of any of its officers, in that, according to the allegations in plaintiff's petition, it was to affect all the stock of the corporation that was put on the market, it mattered not by whom the sales should be made or when or where made; also that, if any such contract was made, the same was without warrant or authority by the board of directors of the corporation, and was not permitted or allowed by such directors, nor was same ever presented before the directors of the corporation for action thereon, and that, if made, it was made without the authority, knowledge, or cognizance of the board of directors, and therefore a recovery thereon against the corporation should be denied.

The case was tried with the aid of a jury, and the following are issues submitted to them with their findings thereon:

"1. Do you find and believe from the evidence in this case that the plaintiff rendered any service to the defendant, World Oil Company, at the request of the defendant World Oil Company through its president, Chester R. Bunker, in procuring or effecting the sale of oil stock in said company upon the partial payment plan? Answer: Yes.

"2. If you have answered the above question No. 1 'no,' then you need not answer this question, but if you have answered the same 'yes,' then answer this question:

"Question: What do you find from the evidence to be the reasonable value, if any, of any service, if any, rendered by the plaintiff to the defendant, World Oil Company, at the request of the defendant World Oil Company through its president, Chester R. Bunker, in procuring or effecting the sale of oil stock in said company upon the partial payment plan?

"In answering the above question, you may take into consideration the customary price prevailing in Fort Worth, Texas, if you find and believe from the evidence there was any such customary price prevailing in Fort Worth paid brokers rendering a like or similar service as that rendered by the plaintiff to the defendant. In the event that you have found that any such service was rendered, not to exceed ten per cent. of all of the moneys received by the defendant from the sale

of stock which stock was sold as a direct and proximate result of the service, if any, rendered the defendant by the plaintiff, in the event you find and believe from the evidence that any stock was sold as a direct and proximate result of any service rendered to the defendant by the plaintiff at the request of the defendant World Oil Company through its president, Chester R. Bunker. Answer: Ten per cent. $45,723.48.

"3. Did the defendant World Oil Company through its president, Chester R. Bunker, on or about the 1st of January, 1926, agree to pay plaintiff 10% of all moneys received by it from the sale of its stock on the partial payment plan? Answer: Yes.

"4. If you have answered the above question No. 3 'no,' then you need not answer this question, but if you have answered the same 'yes,' then answer this question:

"What amount of money, if any, did the defendant, World Oil Company, receive from the sale of its stock sold upon the partial payment plan? Answer: $457,234.80.

"Defendants' specially requested issue No. 1:

"Gentlemen of the Jury: If you have answered Special Issue No. 3 in the Court's main charge in the affirmative, and only in that event, then answer the following questions:

"(a) When did such contract by its terms begin? Answer: On January 1st, 1926.

"(b) When did such contract by its terms end? Answer: On or about September 26, 1926.

"In this case you are instructed to return a verdict herein in favor of the defendant, Chester R. Bunker, and the form of your verdict will be as set out below."

Judgment was rendered in plaintiff's favor against the defendant corporation for $45,-723.48, with interest from its date at 6 per cent. per annum, and that plaintiff take nothing of defendant Bunker. This appeal is by the corporation. Plaintiff has not appealed from the judgment in favor of Bunker.

No ruling was invoked by the defendants on their demurrer or on any of their special exceptions to plaintiff's petition; hence they must be held to a waiver of those exceptions, aside from any question of fundamental error.

At the outset, it is proper to say that, if the evidence offered by the plaintiff was sufficient to constitute a prima facie showing that the defendant Chester R. Bunker was duly authorized to bind the defendant corporation by the contract alleged in plaintiff's petition—a question which will hereinafter be discussed—then the evidence introduced by the defendants was, at all events, of a contrary effect, and the court committed reversible error in refusing to submit to the jury the following special issue requested by the defendant corporation:

"Gentlemen of the Jury: If you have answered special issue No. 3 of the Court's main charge in the affirmative, and only in that event, then answer the following question:

"Question: Was the defendant, Chester R. Bunker, authorized by the Board of Directors of the World Oil Company to make and enter into such a contract with the plaintiff? Answer: ————."

It is hardly necessary to refer to the rule so well established that a party has the right to an affirmative presentation to the jury of any fact pleaded and sustained by evidence which would constitute a right to recovery on the part of plaintiff, or a defense thereto on the part of defendant. Especially was appellant entitled to the submission of that special issue, since issues 1, 2, and 3 of the main charge implied a comment by the court on the weight of the evidence, in that they assumed that Chester R. Bunker was authorized by the defendant corporation to bind it by the alleged contract, notwithstanding that vice in the court's charge was not made the basis of any objection thereto by the defendant. See Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517, and decisions therein cited.

We have reached the further conclusion that the plaintiff failed to introduce evidence sufficient, prima facie, to prove that Bunker was authorized by the defendant corporation to bind it by the terms of the express contract alleged in plaintiff's petition, on which the suit was based. As noted above, on the date the alleged contract was made, to wit, January 1, 1926, the corporation owned no capital stock, but all of it had been issued and paid for by Bunker and other individuals. Nor was there any proof that the corporation ever acquired any of the capital stock originally issued nor any of that authorized by the amended charter procured about May 20, 1926. The proof showed without dispute that the increased capitalization was subscribed by the then stockholders who paid one-half of their subscriptions in cash, and the balance of the subscriptions upon the partial payment plan, by permission of the board of directors so to do, and as it had a right to do, under the provisions of article 1335, Rev. Civ. St. 1925. No proof was offered tending to show that prior to January 1, 1926, the time plaintiff testified the alleged contract was made, the board of directors of the corporation had passed any resolution or taken any steps looking to an amendment of the charter so as to increase the capitalization, as was subsequently done on May 20, 1926. Plaintiff's petition contained no specific allegation that such action had then been taken, and according to plaintiff's own testimony at the time the contract was made, Bunker did not tell him what stock he was going to sell. The only evidence offered by the plaintiff to show such authority on the part of Bunker was

testimony that he was president of the corporation and general manager of the business, bought and sold leases for the company, superintended drilling of wells, etc.; also a resolution passed by the board of directors on September 7, 1926, some eight months after the date of the alleged contract, and more than three months after the charter had been amended and the increase of capital stock authorized by the amendment subscribed by the then existing stockholders, which resolution reads as follows:

"The president then stated that the nature of operations surrounding the business in an oil company, that sometimes it was necessary to further the best interest of the company, for the president, or for those selected by him, to sometimes negotiate for properties, buy or lease properties, and to do other things customarily done in administering the affairs of an oil company, and that he woud respectfully request the Board to empower him and give him full authority to buy and sell, and to do other things necessary to further the interest of the company without delay should the occasion arise. Upon motion of director Moseley and seconded by director Granville, it was resolved that the President of the Corporation, or such officer or director as selected by him, be empowered, and he is hereby empowered to act for the company in the acquisition and sale of properties without the necessity of the details occasioned by the calling of a meeting of the directors; and to act in such capacity as in the President's estimation would best further the interest of the company in the carrying on of the business, same to be ratified at the next meeting thereof of the directors. The question being put the same was thereupon unanimously carried, all the directors voting 'aye' thereon."

It is clear that the resolution, passed long after the contract was executed, could not for that reason confer authority on Bunker to make the contract, and that, in any event, if Bunker had made the contract under that resolution, it would not have bound the corporation until ratified by the board of directors. The authority of Bunker as president and general manager of the corporation at the time of the alleged contract, in any event, was undoubtedly confined to the powers of the corporation under its then existing charter, and did not and could not extend to the making of any contract or take any steps binding on the corporation looking to the amendment of its charter to increase the capital stock, as was subsequently done, in the absence of some ratification of such assumed agency. Not only was there an absence of any proof offered by the plaintiff to show authority in Bunker to bind the corporation by the alleged contract, if the same was made in behalf of the corporation, but the undisputed testimony of Bunker was that there were no minutes of the corporation

which showed any such authority given to him by the board of directors, and that there was no other authorization by the board of directors for him to make such a contract.

■ Even though it could be said that the evidence offered by the plaintiff tended to show that the alleged contract was in fact made, and that in entering into the same it was Bunker's purpose to promote an increase of the capital stock of the corporation through subscriptions for such increase either from the present stockholders or others, and that he intended to bind the corporation after its charter had been so amended by his contract to pay 10 per cent. commission to the plaintiff for advertisement as a necessary expense of such increase of capitalization—although in neither plaintiff's pleadings nor testimony, nor in his briefs filed, was that contention made—nevertheless there was no proof offered to show that the corporation ever became obligated to carry out that contract, for the reason that no evidence was offered to show that either before or subsequently to the amendment of the charter either the stockholders or the directors of the corporation ever had any notice of such prior contract or the advertising that was done by the plaintiff thereunder, or that plaintiff had published the advertisements in reliance thereon, or that such advertisements had been the procuring cause of the subscriptions for the increase of capital stock, or of any other fact which would affect the new issue of stock with the burden of the alleged contract in the advertisement done by plaintiff thereunder. In the absence of such notice, the corporation was not bound by any supposed promotion contract made by Bunker, if in fact such was made. This conclusion is fully sustained by the decision of our Supreme Court in an opinion by Chief Justice Gaines in the case of Weatherford, M. W. & N. W. Ry. Co. v. Granger, 86 Tex. 350, 24 S. W. 795, 40 Am. St. Rep. 837. And, for lack of proof of such authority in Bunker to bind the corporation by the alleged contract with the plaintiff, it follows that plaintiff failed to make out a case entitling him to the recovery sought against the corporation on the alleged express contract, independently of any other issue involved.

In his testimony given upon direct examination by his counsel, plaintiff testified in part as follows:

"I had a contract or agreement with Mr. Bunker with regard to the sale of World Oil Company stock. I made a contract with him on or about that time (referring to January 1, 1926). The contract was not a written contract. It was an oral contract, or an oral agreement. * * *

"I approached Mr. Bunker and I made mention of the fact that his stock was of the actual value at that time of $3 and was selling for 65 cents a share. * * * The company had $900,000 worth of oil money coming from the Humble Company and the World Oil Company was selling stock around 65 cents at that time. Mr. Bunker did not want to sell a lot of his stock at that price. He was not averse to selling it at its actual worth, and my contract with him was that I would go in—well, I asked him if he was going to sell his stock when he got stock up to its value and he told me 'yes,' but there was not any of the brokers that would help him out, and I told him if he would make it where I could make some money I would help him out and increase the desirability of the stock. I told him that I was going to help him out in the sale of his stock by featuring World Oil in my mailing literature, by mailing my literature to his stockholders, each and every time, and by buying up all of the cheap stock that came in on the market. I was going to buy it myself.

"I was not then publishing a market letter at that time, but I started that market letter when I started my contract with Mr. Bunker. In other words, as a result of my conversation with Mr. Bunker. I started this publication known as 'Market and Curb.' Mr. Bunker said with regard to that, after I had made that statement to him that I would help him market his stock, or increase the value, or whatever it was, he said he believed that I would play square with him, and he would take me up on my proposition. His proposition was 10% of the partial payments on World Oil Company stock that was sold; in other words, I agreed to do that for 10% of the actual amount received on partial payments. That was my proposition to Mr. Bunker, and he said that that was satisfactory and that he would do that.

"*I didn't know whether this stock was the stock of the World Oil Company or Mr. Bunker's individual stock; I did not know whose stock it was, that is, I didn't know of my own knowledge.*"

On cross-examination, plaintiff, among other things, testified as follows:

"My contract with Mr. Bunker was that he was to give me 10% on the partial payments when he started selling his stock, and he did not tell me that stock he was going to sell, but he did tell me that he had enough stock to make it well worth my time. Mr. Bunker was to pay me the 10% for all of the stock that was sold, and it would have been sold, his maximum of 100,000 or 300,000 shares wouldn't have lasted sixty days. They would have bought it. They would want to buy it. Mr. Bunker was to pay me on the stock sold. As to how long he was to pay me the 10%, I had no knowledge of how long it woud take to sell that much stock, or as much as he was going to sell. He was to pay me that as long as it would take to sell it. * * *

"Q. You didn't have any agreement as to

how long he was to continue paying the 10%? A. Well, he was to sell that stock.

"Q. What stock? A. The stock that he was going to sell.

"Q. What stock was he going to sell? A. I don't know.

"Q. I don't either. A. I didn't know if that was his stock or treasury stock."

"The capital stock of the World Oil Company was increased to $1,600,000.00, and I believe that was about the first of May, and it was announced about April 15th. * * *

"As to what I was to do under the contract that I say I had with Mr. Bunker, I was to conduct a general brokerage business in listed and unlisted securities, get out that market letter, and keep his stockholders and prospective stockholders advised as to the operations of the World Oil Company, what they were doing in the way of drilling their lease, or any other thing that would be of interest to them, that would create a desirability for their stock. I was also supposed to protect his market, and I did. Mr. Bunker was to pay me 10% for featuring this stock. I didn't feature any other stock during that time. I did, however, offer other stocks for sale. My contract with Mr. Bunker was that I was to conduct a general brokerage business, and in order to conduct a general brokerage business I was compelled to sell other stock. If I didn't, I would be a house organ for Bunker.

"I was to collect the partial payments, and I was not under bond.

"Q. He was just letting you handle the money when you were not under bond? A. I wasn't under bond, because I didn't handle the money.

"Under the contract I had with Mr. Bunker, I was expected to handle the money, under my oral agreement with Mr. Bunker. I expected to handle all the money."

Referring to the occasion on which he claimed the alleged contract was made with Bunker, plaintiff testified as follows:

"Mr. Keeshen was present at the time, but Mr. Bunker and I talked in confidence. Mr. Bunker and I talked in confidence, and Mr. Keeshen didn't hear any of the conversation. He was over there in the far part of the office and he couldn't hear us. * * *

"As to when the World Oil Company put its stock on the market for sale, the company made an announcement under date of April 15, 1926, and it was about April 15 that they made their first offer of the stock. The World Oil Company itself was issuing advertising propaganda at that time; they were carrying information about the World Oil Company in the Western World, their newspaper, the Western World being Bunker's newspaper."

It was further proved without contradiction that the plaintiff employed the World Publishing Company to print some of the issues of "Market and Curb," and that that company extended to him a credit of $500 for such printing in order to enable him to start his publication, he being without means to make a start, and that plaintiff's "Market and Curb" carried various advertisements for sale of leases and stock in many different companies, including mining stock, oil stock, and three leases near the World Oil Company well which belonged to the plaintiff, and in many of those publications those leases were described as being located in the "World Oil Pool" that had been discovered by Chester R. Bunker, who was pictured as a kind of wizard for making such discoveries; and prospective purchasers were strongly urged to "follow Bunker to fortune" and to act quickly. In those issues the year of 1926 was held out as the Golden Age for investments, with visions of enormous profits to investors in all the properties advertised. In other words, the success of Bunker in his discovery of the "World Oil Pool" and in his successful management of the World Oil Company, with a dividend of $900,000, already realized, and which, according to plaintiff's testimony, had accrued prior to the date of his contract, were "featured" as an inducement to the purchase of interests in the three leases owned by the plaintiff and also to investments in other interests advertised. Phenomenal profits made in oil ventures by several other individuals and companies were likewise "featured" for the same purpose.

As shown by the minutes of the corporation there was an annual meeting of the shareholders on January 5, 1926, but no business of any character was then transacted, except the adoption of a resolution to adjourn from day to day until a majority of stock could be represented.

According to the minutes of the corporation there was a meeting of the board of directors on May 18, 1926, at which the only business transacted related to the purchase from Bunker of some real estate situated in the city of Fort Worth.

The next meeting of the board of directors was held on May 19, 1926, at which the purchase of the property mentioned in the meeting of May 18 was confirmed, and Bunker was authorized to enter into a contract for the construction of a building thereon.

On May 20 of 1926 there was a meeting of the shareholders of the World Oil Company, at which the following resolution was adopted:

"Whereas it would appear from the reports of the secretary that the business of the corporation has prospered, and that, as disclosed by the balance sheet of the Secretary reflecting the condition of the corporation up to and inclusive of April 30, 1926, that the assets exceed the liabilities by $804,457.42, and that such excess constitutes a surplus from which an increase of the capital stock may be properly drawn; that whereas it is

advisable that the authorized capital stock of the corporation be increased from $300,-000 to $1,600,000.00, and that $550,000 of the surplus hereinabove mentioned shall be applied to such increase, and that cash subscriptions to such increase to the extent of $100,-000.00 have already been made; therefore, be it resolved, by the shareholders of the World Oil Company, Inc., in meeting assembled: that the capital stock of the corporation be increased from $300,000 to an authorized capital stock of $1,600,000.00 divided into shares of the par value of $1.00 each, and that the present shareholders of the corporation share ratably in $300,000.00 of the increase, drawn from the surplus aforesaid, so that each one of the present shareholders shall receive as dividend stock, one share for each share such shareholder now holds on the books of the company; and that the directors of the corporation be authorized, empowered and instructed to amend the charter accordingly and to carry out the text and purpose of this resolution."

On the same day there was a meeting of the board of directors reciting the action taken in the shareholders' meeting, and instructing the president and secretary to procure an amended charter so as to increase the capital stock of the corporation from $300,000 to $1,600,000, divided into shares of the par value of $1 each, in accordance with the action of the shareholders' meeting.

■ The foregoing constitute all the minutes of the corporation between January 1, 1926, and May 20, 1926, and there is an absence of any action taken in any of those meetings held prior to May '20, looking to an increase of the capital stock by an amendment of the charter of the corporation. It thus appears that, even though it could be said that Bunker was authorized by the corporation to employ plaintiff to render the services alleged in his petition, yet he failed to show a right of recovery on the alleged express contract for each of the following reasons:

First. If, as testified by plaintiff, there was no understanding between him and Bunker as to whose stock it was that was to be sold on the installment plan, and from the proceeds of which he was to receive a commission of 10 per cent. for his services, then no contract was made binding the corporation, since there was no meeting of the minds of plaintiff and Bunker as to that; and Bunker flatly denied making the contract.

■ Second. It was beyond the power of the corporation to bind itself to sell stock in excess of its authorized capitalization, and the contract was necessarily confined to capital stock theretofore authorized amounting to $300,000, in the absence of any evidence that the corporation had already taken proper steps to increase its capital stock and to procure such advertisement, for the purpose of inducing subscriptions to such additional stock. And not only was there an absence of such a showing, but it affirmatively appears from plaintiff's testimony that he did not have in contemplation any such increase in capital stock, but understood that the commission he was to receive was on the sale of shares already authorized in the sum of $300,-000, and the sale of which would be consummated within 60 days; the charter not being amended until after the expiration of approximately five months from the date of the alleged contract, and the notice plaintiff says Bunker gave of such contemplated amendment was not given until April 15, three and one-half months after the date of his alleged contract for employment. The testimony of plaintiff just referred to was as follows:

"Mr. Bunker was paying me the 10% for all of the stock that was sold and that would have been sold, his maximum of 100,000 or 300,000 would not have lasted 60 days."

Furthermore, plaintiff did not allege or prove sale of any of that stock, and the recovery awarded was for commissions on collections on the new stock authorized by the amended charter.

■ Third. If the transaction in which the corporation amended its charter so as to increase its capital stock and allow the subscribers for such increase to pay therefor on the installment plan amounted in law to sale of such stock as contended by plaintiff, then such sales were not consummated until said subscriptions were fully paid; in view of the provisions of article 12, §§ 2 and 6, of the Constitution of Texas, and articles 1336, 1338, and 1339, of Revised Statutes of 1925.

■ The allegations in plaintiff's petition show that the alleged express contract for his employment was executory on both sides, and necessarily implied that the advertisements he was to publish should continue as long as the sales of stock should be in progress, since according to those allegations he was to receive 10 per cent. commission for all sales thereafter made on the partial payment plan. In his petition he alleged that on April 15, 1926, defendants breached said contract by refusing to permit him to collect the amounts then collected from the sale of stock on the partial payment plan; that, notwithstanding such breach, he continued performance of his services until September 25, 1926, and then "quit because defendants had wholly breached their said contract and refused to pay the plaintiff the sums of money they had agreed to pay or any part thereof." The evidence showed that the partial payments for the capital stock subscribed under the amended charter continued from month to month, after September, 1926, until April, 1928, aggregating the total sum of $457,234, of which amount only approximately $261,000 was paid prior to October 1, 1926; and under the alleged express contract plaintiff sought

a recovery for 10 per cent. of such total payments. While he alleged an offer made to defendants before he quit to continue to perform the services he alleged he contracted to render, there was no evidence to support that allegation. Nor was there any basis in his pleadings or evidence for recovery of profits he would have realized over and above his necessary expenses in fully performing all his obligations; and, in view of his admitted abandonment of further efforts to perform his obligations under the contract, he could not recover for the contract price of his services; but his right of action was then on a quantum meruit for the value of the services he did render under the contract. The only pleading asserting a right to recover on that theory was his alternative plea in the second count of his petition, which will be discussed later.

■ The second count in plaintiff's petition was upon the theory of his employment by Bunker as a broker to sell stock with an implied obligation to pay the reasonable value of the services he rendered, which was alleged to be 10 per cent. of the amount realized from the sale of stock on the partial payment plan, and that such was the customary and usual price paid for such services. Following those allegations was the specific allegation that the services so rendered by plaintiff were the procuring cause of the sales of stock made by the defendant company between April 15 and September 26, 1926, on which partial payments had been collected by the company in an aggregate sum of $600,000. That theory of plaintiff's case was presented to the jury in special issue No. 2, wherein they were instructed, in effect, that the reasonable value of the services which were to be determined by them were such services only as were the direct and proximate cause of the sales of stock made by the defendant company. The finding of the jury upon that issue was without any support of evidence legally competent to support it.

As noted above, all the increase of capital stock under the amended charter was subscribed by the former stockholders, who paid one-half of their subscriptions in cash, and the remaining half was paid on partial payments, and 10 per cent. of those partial payments was what the plaintiff sought to recover. If those subscriptions and payments for stock and the issuance of stock therefor could be said to be sales of stock by the corporation on the partial payment plan within the purview of plaintiff's petition—which we gravely doubt—then there was no evidence whatsoever to sustain a finding that the subscribers were induced to subscribe for that stock and make such payments by reason of the advertisements theretofore published by plaintiff in his "Market and Curb," or by any other acts on his part.

For the reasons noted above, the court erred in refusing appellant's request for an instructed verdict in its favor; and accordingly the judgment of the trial court in favor of plaintiff against appellant is reversed, and judgment is here rendered that plaintiff take nothing of appellant. The judgment in favor of defendant Chester R. Bunker, of which no complaint is made, is left undisturbed.

This conclusion renders it unnecessary to determine the merits of further contentions made by appellant that, as a prerequisite to plaintiff's right of recovery, it was incumbent upon him to allege and prove that prior to his employment the defendant corporation had complied with the requirements of Blue Sky Law, even in the absence of any special plea by appellant presenting that question; citing in support of such contention the opinion of the Court of Civil Appeals of San Antonio in Zerr v. Lawlor, 300 S. W. 112.

Reversed and rendered.

### On Motion for Rehearing.

Appellee has filed a motion for rehearing, consisting of 36 typewritten pages, and appellant's reply thereto consists of 30 pages. In the motion for rehearing, appellee challenges the statement made in the opinion on original hearing, to the effect that on January 1, 1926, the date when appellee alleged that his contract with Bunker and the World Oil Company was made, all of the authorized capital stock of the corporation, to wit, $300,000, had been issued and fully paid for. It is pointed out that certain ledger sheets of the corporation appearing as exhibits in the statement of facts show that at that time there was capital stock of the company in its treasury to the extent of $112,870.

In appellant's reply to the motion, the point is made that the evidence conclusively shows that the equitable title of that stock was vested in the former stockholders, and that the company merely held same as trustee for them. To say the least, there is considerable force in that contention, but we shall not attempt to determine whether or not it is exactly true, since the manner in which the corporation was dealing with its stockholders was rather complex; and for the further reason that it is altogether unimportant and wholly immaterial to the conclusions we reached whether or not all the capital stock under the original charter had been issued and paid for.

■ Plaintiff's pleadings and his testimony offered in support thereof clearly show that the recovery he sought, and which was awarded to him, was for 10 per cent. of the money collected on the capital stock of $1,300,000, subscribed for under the partial payment plan and authorized by the amended charter, which was procured about May 20, 1926, and not for 10 per cent. on any stock sold by the corporation and owned by it as treasury stock on January 1, 1926, if any such was

owned and sold. Such was the theory upon which the case was presented and tried, and it is a familiar rule that the appeal must be determined upon that theory. Thomason v. King (Tex. Civ. App.) 1 S.W.(2d) 408; Gates v. Pitts (Tex. Civ. App.) 2 S.W.(2d) 307; Rockhold v. Lucky Tiger Oil Co. (Tex. Civ. App.) 4 S.W.(2d) 1046; Spence v. State National Bank, 5 S.W.(2d) 754, by the Commission of Appeals.

Article 1330, Rev. St. 1925, reads as follows:

"The board of directors, trustees or managers of a corporation may increase its authorized capital when empowered to do so by a two-thirds vote of all its stock, by complying with the provisions of Article 1348 [evidently art. 1308]. Upon such increase of stock being made in accordance with such provisions and certified to the Secretary of State by the directors, and, if the Secretary of State is satisfied that the increase has been made in accordance with law and that the requirements of law have been complied with as to the subscription and payment of stock and in other respects, as on an original application for charter, he shall file such certificate of increase; and thereupon the same shall become a part of the capital stock of such corporation. Such certificate shall be filed and recorded in the same manner as the charter."

And article 1336 provides for the forfeiture of stock and all payments made thereon, if the subscriber fails to pay the same, as required by the board of directors. As pointed out in our former opinion, no evidence of any character was offered to show that on January 1, 1926, the date of plaintiff's alleged contract with the two defendants, there had ever been a stockholders' meeting of the corporation at which an amended charter to increase the capitalization was authorized or contemplated. And no proof was offered to show that the board of directors had passed any resolution looking to the procurement of an amended charter or authorizing Bunker, the president, to solicit subscriptions for any such prospective increase or to incur any character of indebtedness to that end. And in that state of the record we are unable to understand how it can be insisted, as appellee does in this case, that Bunker had legal authority to bind the corporation by the contract alleged in plaintiff's petition, and thereby diminish the value of all stock subscribed under the amended charter as well as the stock under the original charter, to the extent of the amount to be so paid to Hicks; and that, too, in the absence of any notice to the subscribers for the increased capitalization that a deduction of 10 per cent. of the amount paid in by them would be made in favor of Hicks for the advertisements alleged in his petition; in other words, in the absence of any notice to them or former stockholders of the making of said alleged contract.

Appellee further insists that the testimony of Bunker was sufficient to show a definite contract made by the corporation, acting by and through Bunker, its president, to pay him, Hicks, 10 per cent. of all money collected for the stock sold under the amended charter. We adhere to the conclusion reached on original hearing to the contrary of that contention.

In addition to the testimony of Hicks already pointed out in our original opinion, to the effect that Bunker did not tell Hicks whether the stock he was going to sell, and from the sale of which Hicks was to receive 10 per cent. commission for advertising, was stock belonging to the corporation or to Bunker individually, we will quote further from Hicks' testimony the following, which shows an entire failure on the part of plaintiff to show, and an utter lack of proof sufficient to sustain, the alleged contract of the defendant corporation, and on which a recovery was allowed:

"On or about January 1st, 1926, my occupation was that of a broker. * * * On or about that date I had an agreement, or understanding with the defendant, Chester R. Bunker, in regard to my selling the stock of the World Oil Company * * * a Texas Corporation, with a capital of $300,000.00, and Mr. Bunker was the President.

"The proposition was ten per cent. of the partial payments on World Oil Company stock that was sold. * * * I agreed to do that. * * * I don't know whether this stock was the stock of the World Oil Company or Mr. Bunker's individual stock.

"My contract with Mr. Bunker was that he was to give me ten per cent. on the partial payments when he started selling his stock and he did not tell me what stock he was going to sell, but he did tell me he had enough stock to make it worth my while. * * *

"The World Oil Company and Chester Bunker were to pay me. It was not stated as to how much each was to pay me. I was to receive ten per cent. I don't know which one was to pay me.

"When I first started on this campaign for the World Oil Company, the World Oil Company did not then have any stock for sale. It was not contemplated under my agreement with Mr. Bunker that they would offer any stock for sale. They were to put the stock on the market when it got up to a reasonable value. Mr. Bunker told me the World Oil Company was not selling any stock at that time."

Even if the testimony last quoted could in any event be construed as proof of an agreement on the part of Bunker to sell stock for the corporation rather than his own stock,

and pay Hicks 10 per cent. commission thereon for advertisement, then evidently it referred to the stock already issued under the original charter and in the treasury, if there was any such stock in the treasury, and not any stock that might be thereafter issued under any possible future amendment of the charter. At all events, it was too indefinite to prove the alleged contract of employment.

The point is stressed that the evidence showed that the persons who subscribed for the new issue of capital stock under the amended charter were induced to do so by reason of the advertisements published by Hicks and the letters which he mailed to them, and that therefore he showed a right of recovery for the value of his said services. But, as pointed out before, there was not a word of testimony from any witness to support that contention. On the contrary, Hicks himself testified that on January 1, 1926, the stock of the corporation was then worth $3 per share by reason of profits theretofore earned. Those subscribers were all stockholders under the original charter, and no reasonable conclusion can be drawn from the uncontroverted facts in the record than that they made those subscriptions by reason of those profits already earned and knowledge of which they acquired by reason of being such stockholders and their participation in stockholders' meetings.

There was no basis in either the first or second count in plaintiff's pleadings for the recovery of the $14,000 he says he expended for publication of his "Market and Curb." Furthermore, as shown by copies thereof appearing in the record, only a minor portion of the publication was devoted to featuring the World Oil Company's properties; the balance being devoted to advertising plaintiff's own properties and stock of divers other companies, presumably for compensation paid him therefor.

The motion for rehearing is overruled.