### HICKS v. WORLD OIL CO. et al.
### No. 1375—5537.

Commission of Appeals of Texas, Section A.

Jan. 21, 1931.

Samuels, Foster, Brown & McGee, Ireland Hampton, and W. R. Watkins, all of Fort Worth, for defendants in error.

W. D. Nicholson, Mack Taylor, and Clay Cooke, all of Fort Worth, for plaintiff in error.

CRITZ, J.

This suit was instituted in the district court of Tarrant county, Tex., by L. R. Hicks, Jr., against Chester R. Bunker, individually, and the World Oil Company, a corporation, of which L. R. Hicks is alleged to be president and agent, to recover $60,000 alleged by Hicks to be due him by Bunker and the oil company for editing and publishing a certain publication designated in the petition as a "house organ or broker's market sheet." The petition is rather lengthy, but it, in substance, alleges: That on or about January 1, 1926, Bunker, acting for himself individually, and for the World Oil Company, and as president and agent of such company, entered into an oral contract with Hicks, by the terms of which Bunker and the oil company employed Hicks to manage, edit, and publish a "house organ or broker's market sheet," and to push and advertise therein the stock of World Oil Company, and particularly to advertise to the then stockholders of such company the merits of the company and its stock; that Hicks, who was then beginning to conduct, and during the times hereinafter mentioned did conduct, a general brokerage business, should

feature and advertise the sale of World Oil Company stock; that he should exert his efforts through the medium of the above-named publication, and through his business as a general broker, and by featuring said stock and advertising the merits of the same assist in the sale thereof and increase its desirability and consequent value to prospective buyers, including the then stockholders of such company; that said advertising campaign, and other acts to be performed by Hicks, were to continue and be in full force and effect as long as the stock of the World Oil Company was continued for sale to the general public and, the then stockholders in said company, and until said stock should be withdrawn from the market entirely; that the said Hicks was to further assist in the sale of stock in said company, and to accept and receive partial payment made upon stock sold upon the partial payment plan as well as cash orders, and also the said Hicks should furnish and send broker's letters to and advertise to all the customers of his brokerage business, as well as the then stockholders of said company, and to all persons whose names appear upon the list to be furnished him by Bunker and the oil company; that the said Hicks should, in the course of his employment, devote all of his time to the conduct of the advertising campaign of World Oil Company stock, and the conduct of said general brokerage business, featuring the sale of the company's stock; that Hicks agreed and undertook to do and perform all of·the things above set out, and, by featuring said stock, the parties understood, and it was their intention, that such stock should be written up prominently and news items favorable thereto, and favorable to the company, should be prominently displayed in said market sheet or letter.

Hicks further alleged that, in consideration of the above promises and undertakings which he bound and obligated himself to perform, Bunker, on behalf of himself and the World Oil Company, promised and obligated himself and the company to pay to plaintiff the sum of 10.per cent. of all moneys which they might receive from the sale of stock in the World Oil Company sold upon the partial payment plan from and after April 15, 1926, through and during the period for which this contract was to run; that stock in said company which then existed or might be issued was to be offered for sale to the general public, or to the then stockholders of said company, and that payment should be made by Bunker and the oil company to Hicks in such sums for the sale of stock in the manner and way above stated, so long as such stock should remain upon the market, and until the same should be entirely withdrawn from the market.

It is further alleged that Bunker and the oil company agreed to pay Hicks such sum or sums aforesaid, at the time the subscription to said stock was obtained, and the money paid thereon by subscribers thereto, and that such payment should be made regardless of whether partial payments by subscribers of said stock should be received through the plaintiff or by Bunker or the oil company or their agents. It is further alleged that Bunker and the oil company undertook and agreed to extend to Hicks at the beginning of his operations printing credit and the sum of $500 cash, and to furnish the plaintiff the list of the then stockholders of the oil company, together with full data and information upon which said campaign should be conducted; that Bunker and the oil company further agreed that, in order to further secure Hicks in the promises, he should receive 10 per cent. upon all stock sold as above stated. Bunker and .the oil company agreed to notify all stockholders and subscribers that Hicks was their authorized agent to receive orders for stock subscribed upon the partial payment plan, and to receive all partial payments' thereon, and that Hicks should collect all moneys derived by said company·from stock sold upon partial payment plan during the term of the contract.

Hicks further alleges that he, in reliance upon the above-stated contract with Bunker and the oil company, entered upon the employment and began and continued to perform each and all of his promises and obligations, as above set out, and began the publication of the broker's sheet, .and continued the conduct. thereof, and the conduct of the general brokerage business, and began and conducted an advertising campaign for the sale of World Oil Company stock, and pushed the sale of said stock, both by publication and by the conduct of his brokerage business, and fully advertised the conditions of the oil company, and the merits thereof, and sent the publication regularly every two weeks to the stockholders of the company and to the customers of Hicks and the company and to persons appearing upon the list of the brokerage business of Hicks, and otherwise advertised the sale of stock of the company during the period of approximately nine months, and until about the 25th day of September, 1926, when he quit because the defendants had wholly breached their contract and refused to pay Hicks the money they had agreed to pay him or any part thereof.

Hicks further alleges that, during the period between April 15, 1926, and September 25, 1926, stock was sold in the World Oil Company upon the partial payment plan in the sum of $400,000 or in excess thereof. Hicks further alleges that by virtue of the sale of the stock and his performance of the contract, Bunker and the oil company became jointly and severally obligated and bound to pay him the sum of $40,000, and that stock in said sum has been subscribed for during

said period upon the partial payment'plan, and that said sum of $40,000 has become due and payable under the terms of the above-mentioned contract, which Bunker and the oil company have refused to pay.

Hicks then alleges that since the 25th day of September, 1926, Bunker and the oil company have continued to sell and will in the future continue to sell stock upon the partial payment plan in the company, the exact amount of which is unknown to Hicks, but is know to Bunker and the oil company; that the contract is still in force and effect; that said stock is still offered for sale to the general public and to the original stockholders of the company; that said stock has not been withdrawn from the market; and that by reason thereof plaintiff has become entitled to receive upon the sale of such stock sold since the 25th day of September, 1926, and in the future, 10 per cent. upon the same. Hicks also alleges that the money received and to be received by Bunker and the oil company for such stock so sold, and which will be sold in the manner and way aforesaid, is in the approximate sum of $200,000, and that plaintiff, by virtue of his contract as aforesaid, is entitled to have and receive for the sale thereof the sum of $20,000, etc.

Hicks then pleads in the alternative, and repleads all of the facts above set out, and then alleges that Bunker and the oil company, jointly and severally, impliedly promised to pay the plaintiff the sum of 10 per cent. upon all stock which might be sold in the company upon the partial payment plan so long as the stock might remain upon the market, and that, by reason of the efforts of the said plaintiff, the stock of said company became very much more valuable and well advertised, and was sold to a large number of its stockholders and to new subscribers of the company, and that the value of the stock was advanced from the sum of 70 cents per share to $2.60 per share and in excess thereof, and that the conduct by the plaintiff of the advertising campaign, and the other efforts of the plaintiff as hereinbefore described was primarily responsible for the advance on the market for such stock, and for the fact that Bunker and the oil company sold during said period more than $1,000,000 of such stock to the then stockholders of said company and to new subscribers, both for cash and on the partial payment plan; and Hicks further alleges that the reasonable value of his services as hereinbefore set out, according to the custom and practice among oil companies, brokers, promoters, and publishers of market sheets, etc., in the city of Fort Worth, Tex., at said time, which custom was well known to Bunker and the oil company, was the sum of 10 per cent. upon all stock sold upon the partial payment plan under such advertising campaign or in excess thereof, and that the

defendants, and each of them, impliedly promised to pay the plaintiff the reasonable value of said services in accordance with such custom, usage, and practice, and that the reasonable value of the plaintiff's services as aforesaid, is in the sum of $60,000, etc.

Hicks in his prayer for relief prays judgment against Bunker and the oil company jointly and severally for the sum of $60,000, as actual damages sustained by reason of the breach of the contract, and also prays for general and special relief, etc.

The record shows no pleading filed by Bunker individually, but the defendant World Oil Company files an answer embodying a general demurrer, several special exceptions, and a general denial. Also the oil company pleaded that the contract sued on was not in writing; that it was not to be performed within a year from the date of its execution, etc., and therefore unenforceable by reason of the statute of frauds. The oil company also pleaded that the contract alleged by Hicks, if made, was ultra vires the powers of the corporation, and of any of its officers, etc. The company also pleaded that, if the contract was made, the same was without warrant or authority from the board of directors of the corporation, and was not permitted or allowed by the directors, nor was same ever presented before the directors of the corporation for action thereon, and that, if made, it was made without authority, knowledge, or cognizance of the board of directors, and therefore a recovery thereon against the corporation should be denied.

The case was tried before a jury, and the following are the issues submitted, together with the jury's findings thereon.

"1. Do you find and believe from the evidence in this case that the plaintiff rendered any service to the defendant, World Oil Company, at the request of the defendant, World Oil Company through its president, Chester R. Bunker, in procuring or effecting the sale of oil stock in said company upon the partial payment plans? Answer: Yes.

"2. If you have answered the above question No. 1 'No,' then you need not answer this question, but if you have answered the same 'Yes,' then answer this question:

"Question: What do you find from the evidence to be the reasonable value, if any, of any service, if any, rendered by the plaintiff to the defendant, World Oil Company, at the request of the defendant, World Oil Company, through its president, Chester R. Bunker, in procuring or effecting the sale of oil stock in said company upon the partial payment plan?

"In answering the above question, you may take into consideration the customary price prevailing in Fort Worth, Texas, if you find and believe from the evidence there was any such customary price prevailing in Fort

Worth paid brokers rendering a like or similar service as that rendered by the plaintiff to the defendant. In the event that you have found that any such service was rendered, not to exceed ten per cent. of all of the moneys received by the defendant from the sale of stock which stock was sold as a direct and proximate result of the service, if any, rendered the defendant by the plaintiff, in the event you find and believe from the evidence that any stock was sold as a direct and proximate result of any service rendered to the defendant by the plaintiff at the request of the defendant World Oil Company through its president, Chester R. Bunker. Answer: Ten per cent. $45,723.48.

"3. Did the defendant World Oil Company through its president, Chester R. Bunker, on or about the 1st of January, 1926, agree to pay plaintiff ten per cent. of all moneys received by it from the sale of its stock on the partial payment plan? Answer: Yes.

"4. If you have answered the above question No. 3 'No,' then you need not answer this question, but if you have answered the same 'Yes,' then answer this question:

"What amount of money, if any, did the defendant, World Oil Company, receive from the sale of its stock sold upon the partial payment plan? $457,234.80.

"Defendants' specially requested issue No. 1:

"Gentlemen of the Jury: If you have answered Special Issue No. 3 in the Court's main charge in the affirmative, and only in that event, then answer the following questions:

"(a) When did such contract by its terms begin? Answer: On January 1st, 1926.

"(b) When did such contract by its terms end? Answer: On or about September 26th, 1926.

"In this case you are instructed to return a verdict herein in favor of the defendant, Chester R. Bunker, and the form of your verdict will be as set out below."

Based on the above verdict, the trial court entered a judgment in favor of Hicks and against the oil company for $45,723.48, with interest from date of judgment at 6 per cent., and that Hicks take nothing against Bunker individually. The World Oil Company duly appealed to the Court of Civil Appeals for the Second District at Fort Worth, which court reversed the judgment of the trial court and rendered judgment for the oil company. 19 S.W.(2d) 605. The case is now before the Supreme Court on writ of error granted on application of Hicks.

As shown by the pleadings, the alleged contract made the basis of this suit was oral. The only proof in regard to its terms is the testimony of Hicks. He testified on direct examination in regard to the circumstances of the making of the contract and its terms, as follows:

"I am acquainted with the defendant, Chester R. Bunker, and have known Mr. Bunker for five or six years.

"On or about the 1st of January, 1926, my occupation was that of a broker, that is a broker in unlisted securities, a general brokerage business, and I handled stocks. On or about that date I had an agreement or understanding with the defendant, Chester R. Bunker, in regard to my selling the World Oil Company stock.

"Mr. Bunker is the president of the World Oil Corporation, and that was his connection at that time. The World Oil Company was a Texas corporation, with a capital of $300,000, and Mr. Bunker was the president.

"As to whether the World Oil Company was selling any of its stock at about that time to the public, they were not in any general selling campaign; however, they were selling stock; they had not begun a general selling campaign, but were selling stock.

"Around or about January 1, 1926, or somewhere about that time, I had a contract or agreement with Mr. Bunker, with regard to the sale of World Oil Company stock. I made a contract with him on or about that time. The contract was not a written contract. It was an oral contract, or an oral agreement. As to where we were when we made the agreement, I state that we talked it over twice, both times in Mr. Bunker's office, in his private office.

"I approached Mr. Bunker and I made mention of the fact that his stock was of the actual value at that time of $3 and was selling for 65 cents a share. As to what I base the statement on when I say that it was worth $3 a share, the Humble Oil & Refining Company owed the World Oil Company $900,-000, payable out of oil produced in Crockett County, a pool that was discovered by the World Drilling Club No. 1. The company had $900,000 worth of oil money coming from the Humble Company, and the World Oil Company was selling stock around 65 cents at that time. Mr. Bunker did not want to sell a lot of his stock at that price. He was not averse to selling it at its actual worth, and my contract with him was that I would go in—well, I asked him if he was going to sell his stock when he got stock up to its value, and he told me 'Yes,' but there was not any of the brokers that would help him out, and I told him if he would make it where I could make some money I would help him out and increase the desirability of the stock. I told him that I was going to help him out in the sale of his stock by featuring World Oil Company in my mailing literature, by mailing my literature to his stockholders, each and

every time, and by buying up all of the cheap stock that came in on the market. I was going to buy it myself.

"I was not then publishing a market letter at that time, but I started that market letter when I started my contract with Mr. Bunker. In other words, as a result of my conversation with Mr. Bunker, I started this publication known as 'Market and Curb.' Mr. Bunker said with regard to that, after I had made that statement to him that I would help him market his stock, or increase the value, or whatever it was, he said he believed that I would play square .with him, and he would take me up on my proposition. His proposition was 10% of the partial payments on World Oil Company stock that was sold; in other words, I agreed to do that for 10% of the actual amount received on partial pay- ments. That was my proposition to Mr. Bunker, and he said that that was satisfactory and that he would do that.

·"I didn't know whether this stock was the stock of the World Oil Company or Mr. Bunker's individual stock; I did not know whose stock it was, that is, I didn't know of my own knowledge."

On cross-examination, he testified:

"It was not about the 1st of January that I talked with Mr. Bunker about this contract, but it was in the latter part of December, 1925, and after I returned from Colorado was when I first approached him. I went in and told him that his stock was 65¢ per share; you could buy it on the market for 65 or 70 cents. The Humble Oil Company owed them three hundred thousand dollars, and the actual value of the stock was three dollars a share, and I went in and told Mr. Bunker that the stock was worth three dollars a share at that time on that capital. I don't know whether that was the first information that Mr. Bunker had that the stock was worth $3.00 a share or not. I had no information in the matter.

"Q. I say that was the first information he had that the real value of his stock was $3 instead of 65 cents a share, as far as you know? If anybody else told him, you didn't know it? A. Nobody that I know of. Mr. Bunker and I discussed it at the time. He told me that he realized that the brokers in town would not do anything but knock him, and they wouldn't sell it. I went in and saw Mr. Bunker, and that was along in the lat- ter part of December, 1925. He at that time asked me to come back and talk it over with him further. No one was present at that meeting but Mr. Bunker and myself. It was some three, four or five days, or maybe a week, between the first meeting and the sec- ond meeting with Mr. Bunker, and it rocked along until about the 1st of January. Mr. Keeshen was present at the time, but Mr.

Bunker and I talked in confidence. Mr. Bunker and I talked in confidence, and Mr. Keeshen didn't hear any of the conversation. He was over there in the far part of the of- fice and he couldn't hear us. At that time I was still insisting that his stock was worth three dollars a share, actual book value, on the capital of 300,000 shares. I had not had any business relations with Mr. Bunker prior to that time. I did not have the contract in writing between Mr. Bunker and myself. I never suggested that it be in writing. Mr. Bunker just agreed that he would give me 10% on all of the stock that was sold of the World Oil Company on the partial payment plan, and he wouldn't sell it at that price.

"Q. From then on it did not make any difference how long it was sold, you were still to be entitled to that much? A. No, sir. I told him at the time if the people were cognizant of the fact that he had this $900,000 coming from the Humble Oil Company, out of the oil pool that had already been dis- covered, that it would give those people—if you educated those people to that, they would pay what that stock was worth, and he said that he would sell it at $3 a share, but he would not sell it for any less.

"Q. And he agreed with you, didn't you say, from then on, whenever stock was sold on the partial payment plan, that you were to get 10% of the proceeds? A. No; I was to get 10% of the selling campaign, when the selling campaign was arranged. As to how long the selling campaign was to run, I state that it could not have lasted over 60 to 90 days. We did not have any understand- ing as to how long that it would run, for no- body knew. You ask me if I didn't testify that the contract was that I was to have 10% on whatever was sold from that time on, as long as any of the World stock was sold. When did I testify to that? As to whether that isn't alleged in the petition, I don't re- member what is alleged in there.

"Q. You alleged, didn't you, that future sales would amount to so much, and you would be entitled to 10% on future sales? A. If that is in the petition. If that is in the peti- tion. My contract with Mr. Bunker was that he was to give me 10% on the partial pay- ments when he started selling his stock, and he did not tell me what stock he was going to sell, but he did tell me that he had enough stock to make it well worth my time. ·Mr. Bunker was to pay me the 10% for all of the stock that was sold,· and it would have been sold, his maximum of 100,000 or 300,000 shares wouldn't have lasted sixty days. It wouldn't have lasted sixty days; they would have bought it. They would want to buy it. Mr. Bunker was to pay me on the stock sold. As to how long he was to pay me the 10%, I had no knowledge of how long it would take to sell that much stock, or as much as he

was going to sell. He was to pay me that as long as it would take to sell it.

"Q. You didn't have anything to do with the selling? A. He was to sell the stock. He was to offer the stock for sale and recommend me as the broker for the partial payments, the broker authorized to accept the partial payments.

"Q. You didn't have any agreement as to how long he was to continue paying the 10%? A. Well, he was to sell that stock.

"Q. What stock? A. The stock that he was going to sell.

"Q. What stock was he going to sell? A. I don't know.

"Q. I don't either. A. I didn't know if that was his stock or treasury stock."

Bunker denied the contract absolutely. It follows that, if any contract was proved, it must be found in the testimony of Hicks.

 When we come to examine Hicks' testimony to ascertain if we can find the necessary elements of an express contract to pay 10 per cent. of all stock here involved and sold on the installment plan, we find such necessary elements almost totally lacking. In substance, Hicks' testimony shows that he told Bunker the actual value of the stock was $3, and it was selling at 65 cents, that Hicks asked Bunker if he was going to sell his stock when he got stock up to its value; that Bunker told Hicks he was, but none of the brokers would help him; that Hicks then told Bunker that, if he would make it where he could make some money, he would help him out and increase the desirability of the stock; that Hicks told Bunker that he was going to help him out in the sale of the stock by featuring World Oil Company stock in his mailing literature, etc., and by buying up all cheap stock on the market; that Bunker told Hicks he believed he (Hicks) would play square with him, and he would take Hicks up on his proposition; that Hicks agreed with Bunker to these things for 10 per cent. of the actual amount received on partial payments of World Oil Company stock; that Hicks told Bunker that was his proposition, and Bunker said that would be satisfactory. Hicks then swore in effect that there was no understanding whether the contract referred to the stock owned by World Oil Company or was Bunker's individual stock in said company. This, in substance, is the oral contract as testified to by Hicks. It is true that Hicks testifies to a good many things that show to be his construction of the contract. Furthermore, Hicks' testimony is the same in legal effect on direct and cross examination, except on cross-examination he expressly stated that Bunker did not tell him what stock he was going to sell, nor how much, but only said he had enough to make it worth the time of Hicks, and Hicks expressly testified

that he did not know what stock he was going to sell. It is clearly shown that the recovery herein has been had on the sale of stock in World Oil Company sold on the installment payment plan, and obtained by increasing the capital stock of the company; such increase being effected long after the alleged contract was made. There is no statement in the contract, and no evidence in the record, that the company even contemplated increasing its capital stock at the time the contract is contended by Hicks to have been made. This being the case, it is perfectly clear to us that the minds of the parties did not meet and could not have met upon the proposition that Hicks was to advertise the value and merits of the World Oil Company stock in order to enable such company to increase its capital, offer the increased capital stock for sale on the partial payment plan, and pay the plaintiff 10 per cent. of the proceeds thereof, and that regardless of when the stock should be sold or the amount thereof. The conversation between Hicks and Bunker fails to contain any statement to this effect. Furthermore, the conversation between Hicks and Bunker fails to contain the elements of an express contract in several other particulars, but we have said enough to demonstrate that it cannot possibly form the basis of an express contract to increase the capital stock of World Oil Company, and pay Hicks 10 per cent. of all such increased capital stock sold on the partial payment plan.

We now come to consider whether the judgment of the trial court can stand on the findings of quantum meruit arising out of an implied contract of World Oil Company to pay Hicks the reasonable value of services rendered by him to the company in procuring or effecting the sale of the stock in question upon the partial payment plan.

 In our opinion the proof is equally as lacking on this issue as it is on the issue of an express contract to pay a stipulated amount. As shown above, the recovery on a quantum meruit is based upon an alleged implied contract to pay the reasonable value of services rendered in furthering the sale of increased capital stock of World Oil Company. At the time the contract is alleged and contended to have been made, the World Oil Company did not even contemplate increasing its capital stock, and an examination of the record will show that neither Hicks nor the World Oil Company could have so understood it. In fact, Hicks did not even know whose stock he was advertising. Certainly a contract cannot arise by implication of law on a thing that neither party even contemplated at the time. Carpenter v. U. S., 17 Wall. 489, 21 L. Ed. 680. If the judgment of the trial court based on this issue can be sustained at all, it must be upon the theory that there was pleading and proof of an implied contract

by the terms of which World Oil Company was to increase its capital stock and pay Hicks the reasonable value of his services based on the sale thereof on the partial payment plan, advertising the stock so obtained. Such a finding cannot be sustained on a record showing that such was not, and could not have been in contemplation of the parties at the time the conversation between them occurred. Of course we recognize the rule that, where services are rendered by one party for another, and the party for whose benefit the services are performed accepts the benefits thereof under such circumstances as to imply an agreement to compensate the party performing the services, the party receiving the services will in law be held liable to the party performing the same on a quantum meruit.

Finally we hold that there was no agreement between Hicks and World Oil Company binding the company to increase its capital stock, and, since there is no evidence in the record even tending to show that the company then even contemplated such increase, or that Hicks understood such to be contemplated, it follows that it is legally impossible for a contract to exist between the parties binding the company to pay Hicks the reasonable value of his services in advertising and assisting in the sale of such increased capital based on the amount thereof sold on the partial payment plan.

We also refer to and approve the rulings of the Court of Civil Appeals on the questions we have discussed. This ruling settles this case and makes it unnecessary for us to pass on the other issues decided by the Court of Civil Appeals.

We recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.